FILED
CHARLOTTE, N. C.

JAN 27 2006

U. S. DISTRICT COURT
W. DIST. OF N. C.

IN THE UNITED STATES DISTRICT COURT
FOR THE
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| THE IMAGING SOURCE, LLC<br>and LEAD TECHNOLOGIES, INC.<br><br>Plaintiffs,<br><br>v.<br><br>THE IMAGING SOURCE GmbH,<br>DBS Imaging, Inc., and<br>ROLF BOLLHORST<br><br>Defendants. | Civil Action No. 3:06cv36 -K |

# Complaint

Plaintiffs The Imaging Source, LLC ("The Imaging Source") and LEAD Technologies, Inc. ("LEAD"), for their claims against Defendants The Imaging Source GmbH ("DBS"), DBS Imaging, Inc. ("DBS Imaging") and Rolf Bollhorst ("Bollhorst") allege as follows:

### *The Parties*

1. The Imaging Source is a North Carolina limited liability corporation with its principal place of business at 1201 Greenwood Cliff, Suite 400, Charlotte, North Carolina 28204.

2. LEAD is a North Carolina corporation with its principal place of business at 1201 Greenwood Cliff, Suite 400, Charlotte, North Carolina 28204.

3. The Imaging Source GmbH is a German corporation with its principal place of business at Sommerstrassse 36, D-28215 Bremen, Germany. The Imaging Source GmbH was formerly known as DBS GmbH. To avoid confusion, The Imaging Source GmbH will be referred to in this Complaint as DBS.

4. DBS Imaging, Inc. is a North Carolina corporation with its principal place of business at 1201 Greenwood Cliff, Suite 400, Charlotte, North Carolina 28204.

5. On information and belief, Bollhorst is a German citizen residing at Alter Kirchweg 22, 27249 Mellinghausen, Germany. On information and belief, Bollhorst also maintains a permanent residence in the United States at 3321 Old Closeburn Court, Charlotte NC 28210.

### *Jurisdiction and Venue*

6. This is an action for false advertising, trademark cyberpiracy, unfair competition, unfair and deceptive trade practices, breach of fiduciary duty and breach of loyalty, unjust enrichment, misappropriation of trade secrets, and

2

breach of contract. Subject matter jurisdiction is based upon 28 U.S.C. §§ 1331, 1338(a) and (b), and 1367(a). Personal jurisdiction is based on Fed. R. Civ. P. 4(e), (f), and (h) and § 1-75.4 of the North Carolina Code affecting long-arm jurisdiction. Venue is proper in this district under 28 U.S.C. §§ 1391(b)(2), (c), and (d), and 1400(a).

### *Formation and Scope of the Joint Venture Between LEAD and DBS*

7. DBS was a reseller of LEAD software products in Germany. DBS also was a customer of LEAD having developed software programs using LEAD's development software tools. In early 1998, Bollhorst approached LEAD and asked if LEAD would assist Bollhorst and DBS in establishing a business in the United States to market and sell the products that DBS had been selling in Europe into the United States and territories other than Europe. LEAD agreed to do so on the condition that the business in the United States be a joint venture between LEAD and DBS.

8. In March 1998, LEAD and DBS formed a joint venture, which later became known as The Imaging Source. The terms of the joint venture were outlined in a Term Sheet, which was signed by the president of LEAD and by Bollhorst as president of DBS. A copy of the Term Sheet is attached as Exhibit A.

9. Under the terms outlined in the Term Sheet, LEAD owns 51% of The Imaging Source, and a general partnership comprised of DBS principals own 49% of The Imaging Source. At the time, the DBS principals were Rolf

Bollhorst, Heiner Suhr, and Henning Bassmann. DBS later formed DBS Imaging for the purpose of holding DBS' share of the joint venture interest.

10. Also under the Term Sheet, The Imaging Source would be run by three managing directors, with two directors selected by LEAD and one director selected by DBS. The managing director selected by DBS was Bollhorst.

11. As outlined in the Term Sheet, all major decisions of The Imaging Source would require a unanimous consent of all three managing directors. All other decisions would require a majority vote, or approval by two of the three managing directors.

12. The managing directors appointed Bollhorst as Chief Executive responsible for the day to day operations of The Imaging Source. Bollhorst also was a salaried full-time employee of The Imaging Source.

13. The Term Sheet provided that any software published by either LEAD or DBS would be supplied to the joint venture at a 50% margin and that DBS would supply third-party hardware and software to The Imaging Source at DBS' cost.

14. Finally, the Term Sheet stated that neither LEAD nor DBS would have the ability to transfer ownership interest in The Imaging Source without first offering their ownership interest to the other party at the price and terms of the proposed third-party offer.

15. The Imaging Source was formed as the operating entity for the joint venture. LEAD and DBS Imaging entered into the Operating Agreement attached hereto as Exhibit B. Business was conducted through The Imaging Source with The Imaging Source purchasing certain DBS

4

software for resale in the United States. In the case of hardware products, The Imaging Source purchased some third-party products directly from vendors and other products from DBS for resale in the United States. On information and belief, when the relationship was formed, the only products manufactured by DBS were three software products, TX Text Control, Ad Oculos and Grab and View. All hardware and other software products offered by DBS were purchased from third party vendors.

16. The Imaging Source management quickly learned that reselling third party hardware products in the United States market was very price sensitive and it was difficult to generate profits given the margins paid to third-party vendors. Accordingly, The Imaging Source concluded that in order to generate profits, The Imaging Source would need to develop and manufacture its own products.

17. In November 1999, LEAD licensed its FPICS Active X control software ("FPICS") to The Imaging Source for use with frame grabbers sold by The Imaging Source. LEAD developed FPICS at the request of Bollhorst to enable The Imaging Source to sell the frame grabbers that were conceived and developed by The Imaging Source employees. Frame grabbers are devices that capture video from a video source to a digital format. A copy of the licensing agreement is attached as Exhibit C.

18. In addition to FPICS, LEAD developed FPICS2 software, YUV code, and LEADTOOLS, which DBS is now using or has used without permission or license. LEAD also developed the YUV Converter and the RGB Converter. The code has been integrated into a WDM driver used by the cameras and frame grabbers without permission or license. The WDM

5

driver is software that acts as a bridge between the operating system and the hardware device.

19. In addition to the software developed exclusively by LEAD, The Imaging Source conceived and developed IC Imaging Control, which DBS is now using and distributing without permission or license. On information and belief, DBS has also used LEAD's YUV converter code in its IC Imaging Control without permission or license. Finally, an upgraded version of Grab and View software was developed jointly by The Imaging Source and DBS, but was developed using LEAD's software development kit—LEADTOOLS. Redistribution of the LEADTOOLS libraries in Grab and View requires the payment of a runtime license of $75 per copy. DBS is distributing or has distributed Grab and View without paying the necessary runtime licenses required by the LEADTOOLS software license.

20. In addition to software, The Imaging Source conceived and developed frame grabbers, a video to firewire converter, and several cameras for sale by The Imaging Source in its exclusive sales territory. On information and belief, DBS is now selling those products in The Imaging Source's exclusive territory without permission, and also is selling those products in Europe without a proper license.

21. In fact, all of the software and products developed by The Imaging Source or by LEAD for this joint venture were sold exclusively by The Imaging Source in its exclusive sales territory as part of the joint venture between LEAD and DBS. At no time did LEAD or The Imaging Source license any software to DBS or grant any other rights in such products to DBS.

6

22. LEAD also owns all right, title, and interest in the trademark THE IMAGING SOURCE™. LEAD employees established the name and designed the logo. LEAD granted a limited license to the The Imaging Source to use the trademark THE IMAGING SOURCE™ as part of its name, and in its advertising. The Imaging Source first used the trademark in June 1998. LEAD employees also designed and developed the initial website for The Imaging Source.

23. Since June 1998, The Imaging Source had established rights in the domain names www.theimagingsource.com, and in 2000, The Imaging Source purchased the domain name www.imagingsource.com from a third party.

24. Subsequently, DBS requested permission to change its name to The Imaging Source GmbH. LEAD agreed to the change with the understanding that DBS would operate only in Europe. Other than that limited agreement, LEAD did not authorize DBS to use the trademark THE IMAGING SOURCE™ in any way.

### *Actions by DBS in Violation of the Joint Venture Agreement*

25. In October 2005, the two managing directors appointed by LEAD expressed some concerns to Bollhorst about certain irregularities in the accounting records of The Imaging Source. They requested a meeting with Bollhorst to discuss the issues and to establish a plan going forward.

26. Bollhorst and the other managing directors held a meeting in Charlotte in December 2005. In that meeting, LEAD's appointed managing directors suggested several options for moving forward. Although Bollhorst

agreed to a plan to continue the business, he was not willing to formally sign off on the plan and he ultimately resigned. Bollhorst's formal resignation was tendered to The Imaging Source on December 22, 2005, effective December 31, 2005. A copy of that resignation is attached as Exhibit D.

27. Shortly after Bollhorst resigned, The Imaging Source began receiving reports that Bollhorst was taking unauthorized steps to shift business from The Imaging Source to DBS.

28. First, The Imaging Source learned that Bollhorst or DBS had removed all mention of The Imaging Source's address and phone numbers on its website, and instead had provided only the address and phone number for DBS.

29. Second, The Imaging Source learned that Bollhorst or DBS had terminated the system whereby customer and prospective customer emails were routed to The Imaging Source. Instead, Bollhorst or DBS changed the system so that all customer and prospective customer emails were routed directly and solely to DBS.

30. Third, on information and belief, Bollhorst or DBS has sold products to customers and prospects of The Imaging Source, and is directing those customers to communicate directly with DBS in Germany.

31. Fourth, on information and belief, The Imaging Source learned that Bollhorst or DBS had been contacting vendors of The Imaging Source, and was directing those vendors to communicate directly with DBS in Germany. For example, The Imaging Source has been informed that Bollhorst contacted Nexus Technologies, a camera-circuitry vendor for The Imaging Source, and requested that all future communications be directed to DBS.

8

32. Fifth, on January 6, 2006, five days after his resignation as president, Bollhorst contacted an employee of The Imaging Source and told the employee to return all The Imaging Source's inventory of new cameras to DBS. Six days after that, on January 12, 2006, Bollhorst contacted a second employee of The Imaging Source and told that employee to return all The Imaging Source inventory to Germany.

33. Sixth, on information and belief, Bollhorst and DBS have taken steps to set up a DBS sales office in the United States, in violation of their agreement with LEAD and The Imaging Source. For example, Sebastian Bollhorst (Bollhorst's son), while still in the Imaging Source offices, obtained contracts and quotations for a business account with Time Warner cable for internet, applied for credit in the name of DBS Imaging, Inc., and told The Imaging Source employees that he was setting up a new office for DBS.

34. Seventh, on information and belief, Bollhorst and DBS have attempted to hire The Imaging Source employees and have encouraged one employee to breach the non-compete clause in his employment agreement by going to work for DBS Imaging.

35. Eighth, on information and belief, Bollhorst had Sebastian Bollhorst enter The Imaging Source's work place and remove a computer owned by The Imaging Source.

36. Ninth, on information and belief, and without LEAD's knowledge, Bollhorst caused the removal of all LEAD products from The Imaging Source website as well as any mention of the fact that The Imaging Source is a joint venture between LEAD and DBS.

37. Finally, on January 12, 2006, The Imaging Source learned that the password to its online bank account had been changed. Previously, The Imaging Source had changed the password to the account in an effort to secure the account due to Bollhorst's actions described above, since The Imaging Source knew that Bollhorst had been a signatory on the account. On January 13, 2006, The Imaging Source learned that Sebastian Bollhorst had come to the bank and, based on a power-of-attorney received from Bollhorst, tried to close the account and transfer all of the funds in the account to another account in the name of DBS Imaging, Inc. The bank would not accept the power-of-attorney and required an officer and signatory on the account visit the bank in person to transfer funds or close the account.

38. LEAD and The Imaging Source have made several attempts to peacefully resolve the issues with DBS and Bollhorst, both before and after the actions taken by Mr. Bollhorst and DBS outlined above, and have attempted to speak to Bollhorst and requested that Bollhorst honor his fiduciary duty and refrain from taking any further action adverse to the interests of The Imaging Source. In response, Bollhorst has refused to limit his actions, and continues to act in ways contrary to his obligations to The Imaging Source.

## *COUNT I – False Advertising*

39. LEAD and The Imaging Source reallege and incorporate herein the foregoing allegations of this Complaint.

40. DBS' use of the trademark, THE IMAGING SOURCE™, is a use in interstate commerce of words and symbols, a false designation of origin, or

10

a false description or representation. Such use has misled and deceived, and will continue to mislead and deceive, the public into believing that DBS' counterfeit and infringing merchandise originates with The Imaging Source, is licensed by The Imaging Source, or is in some way sanctioned by, or otherwise affiliated with, The Imaging Source.

41. DBS' unauthorized association of the counterfeit and infringing merchandise with The Imaging Source has resulted in profits to DBS and has thereby deprived The Imaging Source of revenue to which it is entitled.

42. By so imitating, counterfeiting, and infringing The Imaging Source's trademark in interstate commerce, DBS has violated Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

43. By reason of the foregoing, The Imaging Source has been injured in an amount not yet ascertained and is entitled to the remedies provided for in 15 U.S.C. § 1116 *et seq.*

### *COUNT II – Trademark Cyberpiracy*

44. LEAD and The Imaging Source reallege and incorporate herein the foregoing allegations of this complaint.

45. On information and belief, DBS has a bad faith intent to profit from unauthorized use of the trademark, THE IMAGING SOURCE™.

46. The trademark, THE IMAGING SOURCE™, is distinctive, and DBS' uses a domain name that is identical or confusingly similar to the trademark THE IMAGING SOURCE™.

11

47. DBS' use of a domain name that is confusingly similar to THE IMAGING SOURCE™ is likely to cause consumers mistakenly to believe that the imagingsource.com website, is sponsored or approved of by The Imaging Source, or that DBS is otherwise affiliated with or has obtained permission from The Imaging Source to use the domain name.

48. By engaging in the activities described above, DBS is engaging in cyberpiracy in connection with services distributed in interstate commerce in violation of Section 43(d) of the Lanham Act, 15 U.S.C. § 1125(d).

49. By reason of the foregoing, The Imaging Source has been injured in an amount not yet ascertained and is entitled to the remedies provided for in 15 U.S.C. § 1125(d).

### *Count III – Unfair Competition*

50. LEAD and The Imaging Source reallege and incorporate herein the foregoing allegations of this complaint.

51. DBS' and Bollhorst's use of copies of the trademark THE IMAGING SOURCE™ constitutes passing off, infringement, and misappropriation of the trademark, actionable under the law of unfair competition.

52. By reason of the foregoing, The Imaging Source has been injured in an amount not yet ascertained, and is entitled to monetary and equitable remedies.

12

## Count IV – Unfair and Deceptive Trade Practices

53. LEAD and The Imaging Source reallege and incorporate herein the foregoing allegations of this complaint.

54. DBS' and Bollhorst's misappropriation, counterfeiting, and infringement of the trademark THE IMAGING SOURCE™ constitute the assumption, adoption, or use, with intent to deceive or mislead the public, for advertising purposes or for the purposes of trade, a symbol or simulation thereof or a part of a symbol or simulation thereof, which may deceive or mislead the public into believing that a connection exists between the DBS and The Imaging Source.

55. By so misappropriating, counterfeiting, and infringing The Imaging Source's trademark, DBS and Bollhorst have violated North Carolina's Unfair Trade Practices Act, North Carolina General Statute § 75-1.1.

56. By reason of the foregoing, The Imaging Source has been injured in an amount not yet ascertained and is entitled to the remedies provided for in N.C. Gen. Stat. § 75-15, 16, and 16.1.

## Count V – Breach of Fiduciary Duty and Duty of Loyalty

57. LEAD and The Imaging Source reallege and incorporate herein the foregoing allegations of this complaint.

58. As a manager of The Imaging Source, Bollhorst has an affirmative duty to act in the company's best interests, to refrain from self dealing transactions and from usurping opportunities rightfully belonging to the company.

13

59. Bollhorst breached his duty of loyalty to The Imaging Source when he sought to profit personally and through DBS at the expense of The Imaging Source, through the actions described herein.

60. By reason of the foregoing, The Imaging Source and LEAD have been injured in an amount not yet ascertained, and are entitled to monetary and equitable remedies.

## COUNT VI – Unjust Enrichment

61. LEAD and The Imaging Source reallege and incorporate herein the foregoing allegations of this complaint.

62. LEAD and The Imaging Source expended large sums of money training The Imaging Source and DBS employees, developing and testing its software and hardware for sale by The Imaging Source, and building relationships with customers throughout the United States. DBS and Bollhorst are attempting to unfairly profit from LEAD's efforts by engaging in the activities detailed above.

63. By reason of the foregoing, The Imaging Source and LEAD have been injured in an amount not yet ascertained, and they are entitled to monetary and equitable remedies.

## Count VII – Misappropriation of Trade Secrets

64. LEAD and The Imaging Source reallege and incorporate herein the foregoing allegations of this complaint.

65. The YUV code developed by LEAD is and has been maintained as a trade secret by LEAD.

66. The YUV code was licensed by LEAD to The Imaging Source as part of the FPICS software licensing agreement. Under the terms of the agreement, The Imaging Source was prohibited from modifying, decompiling, disassembling, or reverse engineering FPICS. Furthermore, no license to the YUV source code was granted to The Imaging Source.

67. Nevertheless, on information and belief, Bollhorst acquired the YUV source code and used it to develop DBS' IC Imaging Control software.

68. Bollhorst's actions constitute a misappropriation of LEAD's trade secret under the North Carolina Trade Secret Protection Act, N.C. Gen. Stat. § 66-152.

69. By reason of the foregoing, LEAD and The Imaging Source have been injured in an amount not yet ascertained, and are entitled to monetary and equitable remedies in accordance with N.C. Gen. Stat. § 66-154.

## *Count VIII – Breach of Contract*

70. LEAD and The Imaging Source reallege and incorporate herein the foregoing allegations of this complaint.

71. The Operating Agreement required that dealings between the related parties require unanimous consent of the managers.

72. Bollhorst and DBS breached the Operating Agreement by modifying purchase terms between DBS and The Imaging Source, purchasing vehicles for Bollhorst family members, assigning development projects to

15

DBS, and establishing additional loans without the unanimous consent of the managers, attempting to withdraw funds from The Imaging Source bank account, and other actions identified herein.

73. Bollhorst's and DBS' actions constitute a breach of the Operating Agreement, and therefore a breach of contract.

74. By reason of the foregoing, LEAD and The Imaging Source have been injured in an amount not yet ascertained, and are entitled to monetary and equitable remedies.

### *Prayer for Relief*

WHEREFORE, Plaintiffs LEAD Technologies, Inc. and The Imaging Source, L.L.C. respectfully prays that this Court:

1. Issue a preliminary and permanent injunction restraining, enjoining, and prohibiting The Imaging Source Gmbh ("DBS"), DBS Imaging, Inc. ("DBS Imaging"), and Rolf Bollhorst, their agents, servants, employees, officers, successors and assign, attorneys, and all persons, firms, and corporations acting in concert or participation with DBS, DBS Imaging, or Bollhorst, or on DBS', DBS Imaging's, or Bollhorst's behalf, from:

    a. using the mark THE IMAGING SOURCE™, or any other name, word, or mark likely to cause confusion with the mark THE IMAGING SOURCE™;

    b. using the domain name www.imagingsource.com, www.theimagingsource.com, or any other domain name that is likely to confuse, mislead, or deceive others into believing that any website sponsored by DBS, DBS Imaging, or Bollhorst, is affiliated with, emanate from, are

connected with, sponsored by, or approved by The Imaging Source, LLC, or LEAD;

  c. doing any other act likely to confuse, mislead, or deceive others into believing that DBS, DBS Imaging, or Bollhorst, or their products are affiliated with, emanate from, are connected with, sponsored by, or approved by The Imaging Source, LLC, or LEAD;

  d. establishing any business within the exclusive sales territory of The Imaging Source that would compete with the products sold by The Imaging Source;

 2. Award The Imaging Source and LEAD an equitable accounting of DBS', DBS Imaging's, and Bollhorst's profits, and award damages in an amount yet to be determined but equal to treble the greater of DBS', DBS Imaging's, and Bollhorst's profits, LEAD and The Imaging Source's actual or statutory damages, plus pre-judgment and post-judgment interest, costs, and attorneys' fees associated with this action pursuant to The Imaging Source's and LEAD's claims for false advertising under the Lanham Act, 15 U.S.C. § 1116 *et seq.;*

 3. Award The Imaging Source and LEAD up to treble the amount equal to the greater of DBS', DBS Imaging's, and Bollhorst's profits, or LEAD and The Imaging Source's actual damages, plus costs and attorneys' fees associated with this action under the North Carolina Unfair Trade Practices Act, N.C. Gen. Stat. §§ 75-15, -16, and -16.1;

 4. Award The Imaging Source and LEAD up to treble the amount equal to the greater of DBS', DBS Imaging's, and Bollhorst's profits, or LEAD and The Imaging Source's actual damages, plus costs and attorneys'

17

fees associated with this action under the North Carolina Trade Secret Protection Act, N.C. Gen. Stat. §§ 66-154;

      5. Award The Imaging Source and LEAD damages pursuant to North Carolina's common law of unfair competition in an amount equal to the greater of DBS', DBS Imaging's, and Bollhorst's profits, or LEAD and The Imaging Source's actual damages;

      6. Award The Imaging Source and LEAD damages pursuant to North Carolina's common law of unjust enrichment in an amount equal to the greater of DBS', DBS Imaging's, and Bollhorst's profits, or LEAD and The Imaging Source's actual damages;

      7. Award The Imaging Source damages resulting from Bollhorst's breach of his fiduciary duty and duty of due care;

      8. Award The Imaging Source damages resulting from DBS', DBS Imaging's, and Bollhorst's breach of contract;

      9. Require DBS, DBS Imaging, and Bollhorst to deliver up to The Imaging Source for destruction all labels, signs, prints, packages, wrappers, receptacles, and advertisements in DBS', DBS Imaging's, or Bollhorst's possession or control that bear the trademark THE IMAGING SOURCE™;

      10. Require DBS, DBS Imaging, and Bollhorst to file with the Court and serve upon The Imaging Source a report in writing, under oath, setting forth in detail the manner and form in which DBS, DBS Imaging, and Bollhorst have complied with the terms of any injunction entered by this Court; and

18

Case 3:06-cv-00036-DCK  Document 1  Filed 01/27/06  Page 18 of 19

11. Award The Imaging Source and LEAD such other and further relief as this Court deems to be reasonable, just, and equitable.

This 27th day of January, 2006.

*/s/ Albert P. Allan*

Albert P. Allan
N.C. Bar No. 18882

R. Brian Johnson
N.C. Bar No. 27663

SUMMA, ALLAN & ADDITON P.A.
11610 North Community House Road, Suite 200
Ballantyne Corporate Park
Charlotte, North Carolina 28277
Telephone: (704) 945-6700
Facsimile: (704) 945-6735

Attorneys for Plaintiffs The Imaging Source, LLC and LEAD Technologies, Inc.

S:\FIRM DOCS\4220\1\Complaint Rev 2.doc